UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 21-CR-20377-DPG-1

UNITED STATES OF AMERICA,

    Plaintiff,

v.

JUAN JOSE VALENCIA ZULUAGA,

    Defendant.
_____/

### NOTICE OF DEFENDANT'S ALLEGED COMMISSION OF MISCONDUCT NOT INCLUDED IN PRESENTENCE INVESTIGATION REPORT

    Undersigned counsel, **SIMON T. STECKEL**, a member in good standing of this Court and the Florida Bar, and pursuant to S.D.Fla.L.R.11.1(c), which mandates that the standards of professional conduct of members of the Bar of this Court are governed by the current Rules Regulating The Florida Bar, herein files this notification to this Court of the alleged commission of misconduct committed by defendant Juan Jose Valencia Zuluaga ("Zuluaga"), who is presently scheduled for sentencing before this Court on April 13, 2023.

    Despite the fact that undersigned counsel has communicated with Government's counsel prosecuting Zuluaga, Assistant United States Attorney Ellen D'Angelo, the lead DEA agent, Paul Cohen, and counsel for Zuluaga, David Fernandez ("Fernandez"), regarding the existence of the FBI's purported investigation of Zuluaga, Manuel Gil, and others for alleged misconduct which occurred before Zuluaga entered a guilty plea herein on October 14, 2022, and has continued thereafter, none of the parties have expressed any sincere interest in further investigating Zuluaga's alleged misconduct (which, based on information and belief after

1

converations with the prosecutor, are not noted in Zuluaga's presentence investigation report for consideration by this Court) or bringing it to the Court's attention. Having knowledge of Zuluaga's alleged misconduct (and others), through converations with Joel Vigo ("Vigo"), a jeweler never previously arrested or involved in any criminal acts, and being present for Vigo's interview by FBI agents, undersigned counsel believes this Court should be advised of Zuluaga's alleged misconduct to avoid the possibility that a fraud will be perpetuated at any sentencing hearing by this information being omitted from consideration by this Honorable Court. .

In a nutshell, Fernandez and his family have known Vigo for at least eight years. Fernandez and his family have bought jewelry from Vigo many times during those years and Fernandez has had clients sell Vigo jewelry the proceeds of which would be used as legal fees. Leif Fernandez initially introduced Vigo to Manuel Gil ("Gil") for jewelry related business purposes.  For over five years, Gil purchased jewelry from Vigo for resale, or otherwise, sometimes on consignment.

Vigo was advised that when Zuluaga was arrested in Colombia concerning the instant case, Gil was present. Further, Vigo had been advised by Gil that Zuluaga had been cooperating with the government even prior to his extradition to the United States.  In fact, Gil and Zuluaga were such good friends that Gil purchased three watches as gifts for Zuluaga prior to his arrest, from Vigo, at a cost of well over $100,000.00  Presumably, the lead DEA Agent in this case, Paul Cohen, was either present when Zuluaga was arrested, or would have also later known that Gil was with Zuluaga when the latter was arrested.  Although Gil advised that he was temporarily detained during Zuluaga's arrest, he was later released. Therafter, at or around the time that Zuluaga was extradited from Colombia, Gil, who now advised Vigo that he was handling Zuluaga's affairs for him, approached Vigo, to "borrow" $250,000.00 from Vigo to pay

Fernandez legal fees to represent him in this case. Gil agreed to repay Vigo "right away" sugggesting that he could have the funds back to Vigo within 24 hours from Zuluaga. Vigo agreed, as long as there was a paper trail to Fernandez showing the actual payment of purported legal fees directly to him. Subsequently, Vigo contacted his bank and obtained confirmation that the money was sent to, and received by, Fernandez. Fernandez was aware of this arrangement and instantly accepted the money from Vigo without objection. Upon agreeing to lend the $250,000.00 from Vigo to Gil for the benefit of Zuluaga's legal fees for Fernandez, Leif Fernandez negotiated a credit of $50,000 from Vigo for outstanding jewelry invoices purchased by Fernandez' brother and father, at $25,000.00 apiece. Thus, $50,000.00 of the alleged borrowed money for Zuluaga's legal fees was diverted to the benefit of Fernandez's brother, Leif Fernandez and Fernandez's father, at $25,000.00 apiece to reduce their unrelated jewelry debts to Vigo. Hence, this ultimate theft of money from Vigo was used to benefit Zuluaga, Fernandez, Leif Fernandez, and Fernandez's father. Nonetheless, when Vigo made repeated requests for repayment, he was repeatedly rebuffed by Gil, later blaming the delays on Zuluaga selling a building in Colombia for $13,000,000. Although the Fernandez's were aware of these nonpayment and theft issues from Vigo, and enjoyed the ill gotten proceeds, none of them ever attempted to remedy the situation. And this is despite the fact that Leif Fernandez introduced Gil to Vigo in the first place. Finally, based upon information and belief, none of this information is contained in Zuluaga's PSI or was ever divulged to his US Probation Officer. And since Zuluaga is now being sentenced subject to a cooperation plea agreement with the government, the undersigned has been led to believe that none of these facts were divulged by Zuluaga during his obvious debriefings.

To supposedly try to repay Vigo for the $250,000.00 in legal fees he directed to Fernandez to represent Zuluaga, Gil attempted to try to get Vigo to participate in drug deals and money laundering transactions with Zuluaga. Vigo repeatedly turned him down, telling Gil that he was a jeweler, not a drug dealer, and later reported Gil's criminal attempts to the FBI. Additionally, after Gil became aware that Vigo was going to go to law enforcement to disclose Gil's crimes and Vigo's victimization, he forwarded to Vigo a letter outlining what he would do to him and his family if he tried to disclose Gil's crimes and/or collect the money he gave to Fernandez for Zuluaga. More importantly, through a mutual acquaintence, Vigo also learned that Gil stated that he never intended to repay Vigo for the $250,000.00 given to Fernandez to represent Zuluaga and that the collection of money from Vigo to benefit Zuluaga, Fernandez, Leif Fernandez, and Fernandez's father was a fraud and a theft from day one.  Lastly, on March 8, 2023, Fernandez' brother texted Vigo to tell him that he could go by Fernandez' law office to talk about the owed money. Vigo did not go. Instead he sought legal assistance.

Rather than meet with Fernandez, Vigo contacted the undersigned counsel who then reported the foregoing to the FBI, who then interviewed Vigo. Undersigned counsel then further contacted the Asssistant United States Attorney assigned to the Zuluaga prosecution and requested a continuance of said upcoming sentencing so that these criminal acts might be fully investigated and reported back to this Honorable Court before the imposition of sentence.  As their was no urgency for this sentencing in the absence of these serious questions of Zuluaga's potential culpability in this theft being fully answered for this Honorable Court, the undersigned did not expect the government's position.  However, rather than seek to fully investigate all of the criminal acts and other law violations contained within this newly disclosed situation prior to the imposition of sentence, the government has sought to ignore the seriousness of this matter

4

and avoid any complication of it's apparent intended result for Zuluaga, clearly at the expense of an innocent victim, Vigo. Thus, earlier today the prosecutor, in an email to undersigned counsel on the eve of sentencing, advised that "the FBI ha[d] found: (1) no identified direct link between Mr. Vigo and Mr. Valencia Zuluaga, and (2) no predication to investigate a purported contractual agreement and monetary exchange between Mr. Gil and Mr. Vigo absent additional evidence or facts." The prosecutor's reference to a purported FBI investigation *was no investigation at all*, as no evidence exists that the FBI or any other Government agent interviewed any of the participants – Gil, Fernandez, Fernandez and his family, Zuluaga, or other proffered witnesses. Moreover, records from banks utilized by Vigo and Fernandez would establish the financial connection between these two men, and Zuluaga, showing the transmission of over $200,000 from Vigo to Fernandez, which the latter would have presumably declared as a legal fee received from Vigo to represent Zuluaga. Undoubtedly, Fernandez would have inquired from his client Zuluaga as to why a third party – Vigo – would be paying for his legal fees and determined whether there was any conflict. Lastly, while undersigned counsel offered to produce Vigo for interview with Ms. D'Angelo, she expressed no interest in that. It is no wonder that AUSA D'Angelo concluded that she saw "no basis to treat the information that has been provided as anything other than unsubstantiated allegations" when the Government has done nothing to try and substantiate it. But the Government insists on proceeding with Zuluaga's sentencing hearing in order to avoid any such obvious disclosure. In such a situation it is the Court that is misled.

As an officer of the Court, undersigned counsel is concerned about the following:

1. That this Court may not be apprised about alleged misconduct committed by Zuluaga before and after entering a guilty plea (which is not included in the PSR) prior to sentencing him;

2. What Fernandez knows about his receipt of funds from Vigo to pay for Zuluaga's legal representation;

3. That the fees received by Fernandez to represent Zuluaga in this case constitute proceeds of a crime;

4. Whether Fernandez can continue as conflict-free counsel of record for Zuluaga;

5. Whether Zuluaga disclosed his ownership in a building worth $13,000,000 in the PSR; and

6. Whether the Government had knowledge of the pending sale of a building by Zuluaga in Colombia for $13,000,000 and if that is the source of the funds to be used to pay the forfeiture amount when it was agreed that his forfeiture amount would only total $500,000.00.

Undersigned counsel recognizes that this filing is unusual. But that is because in over 40 years of practice I have never witnessed a federal criminal case in which neither party, especially the Government, has avoided investigating previously unknown alleged misconduct committed by a defendant prior to sentencing, especially if it involves someone who has cooperated with the Government and could possibly be rewarded with a 5K motion to reduce his sentence. Having seen prosecutors argue against the application of an acceptance of responsibility reduction for a mere dirty urine, it is mind numbimg to hear the government not want to investigate the information of alleged criminal acts by Zuluaga contained in the proffer of Vigo.  It is

undersigned counsel's intention to be present at Zuluaga's sentencing hearing on April 13, 2023, along with Mr. Vigo, who will be available to provide testimony if deemed necesaary by this Honorable Court.

> Respectfully submitted,
>
> Simon T. Steckel
> Florida Bar No. 343595
> Bank Of America Tower
> 701 Brickell Avenue
> Suite 1550
> Miami, Florida 33131
> Tel. (305) 373-1900
> Email: sts1law@bellsouth.net
>
> By:  */s/ Simon T.Steckel*
> Simon T. Steckel

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was tendered via CM/ECF to the Clerk of the Court and all parties of record, and via email to Assistant United States Attorney Ellen D'Angelo at ellen.d'angelo@usdoj.gov and counsel for Zuluaga, David Fernandez, at david@davidfernandezlaw.com, and to USPO Kira Harmeling at Kira_Harmeling@flsp.uscourts.gov, on this 12th day of April 2023.

> */s/ Simon T.Steckel*
> Simon T. Steckel